## *Ex parte* AH OI.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED AUGUST 12, 1901.     DECIDED AUGUST 26, 1901.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

A Justice of the Supreme Court is not disqualified from sitting in a case with which he has had no previous connection, merely because a question of law is involved which was involved also in certain other and distinct cases at the trial of which he had presided when a Circuit Judge. The provision in Section 84 of the Organic Act that, "No judge shall sit on an appeal, or new trial, in any case, in which he may have given a previous judgment," does not apply to such a case.

Under our statutes, an appeal lies to the Supreme Court from a Circuit Judge at Chambers in a habeas corpus case, whether the order of the Circuit Judge be for the discharge or the remand of the prisoner.

During the period between the annexation of these islands to the United States and the establishment of Territorial government, persons accused of crimes could lawfully be prosecuted without the intervention of a grand jury and convicted by nine out of twelve trial jurors.

OPINION OF THE COURT BY FREAR, C.J.

(Galbraith, J., dissenting.)

This is an appeal from an order discharging the petitioner in habeas corpus proceedings on the ground that the indictment on which he was convicted was not found by a grand jury and that the verdict upon which he was sentenced was not unanimous.

The prisoner had been indicted, tried, convicted and sentenced at the August Term, 1899, of the Circuit Court of the First Circuit, that is, during the period between the annexation of these islands to the United States by the Joint Resolution of Congress of July 7, 1898, and the establishment of a Territorial government here on June 14, 1900, by the Act of April 30, 1900. His offense was burglary; his sentence, imprisonment for ten years. The indictment was found a true bill by the Circuit Judge, as formerly required by Hawaiian law. The verdict was rendered by ten of the twelve jurors, as formerly permitted by Hawaiian law. He was discharged in the habeas corpus proceedings on the supposition that the provisions of Hawaiian law which had for the previous sixty years permitted indictments to be found by judges of courts of record and verdicts to be rendered by nine of twelve jurors were rendered invalid upon the annexation of these islands to the United States.

1. This is one of several appeals in habeas corpus cases which were heard in this Court at the same time because they involved similar questions. Since this case was submitted, counsel for the petitioner have called our attention to the fact that in the criminal cases in which the petitioners in the other habeas corpus cases were sentenced, Mr. Justice Perry, now a member of this court, was the Circuit Judge who found the indictments, presided at the trials and pronounced the sentences, and it is suggested that he is disqualified from sitting on the appeals or taking part in the decisions in those cases by reason of the provision in Section 84 of the Organic Act that, "No judge shall sit on an appeal, or new trial, in any case, in which he may have given a previous judgment," and that he is disqualified from sitting in this case also, because all these cases were heard at the same time. These cases, though heard at the same time for convenience, since they involved similar questions of law, are separate and distinct cases, and the fact, if fact it is, that a member of the court is disqualified by the provision in question from sitting in other cases in which the same questions of law are involved, would not disqualify him from sitting in this case. Of course,

the mere fact that he had previously expressed an opinion in another case on the questions of law involved would not disqualify him. If that were so we should all be disqualified, not only in all these cases but perhaps in half the cases that come to this court. Whether Mr. Justice Perry is disqualified from sitting in the other cases, will be considered in the decision of those cases.

2. It is strenuously contended that no appeal lies in habeas corpus cases. No doubt judgments in such cases are usually held not reviewable by appeal or writ of error in the absence of statute. Whether appeals may be taken in such cases as well as in other cases under a general statute relating to appeals, or whether such cases must be specifically mentioned are questions upon which different views have been entertained. There is also some difference of opinion as to the advisability of allowing appeals in such cases. On the one hand it is urged that the remedy by habeas corpus was designed to be speedy and that it should be so in cases involving the right of personal liberty. On the other hand it is urged that questions of the gravest importance may be presented in such cases and that to allow any person imprisoned for crime after a careful trial resulting in a verdict by a jury, a sentence by the court, and after an affirmance by the Supreme Court, to obtain a discharge whenever he can find any judge who thinks that the proceedings were invalid, would be dangerous in the extreme. The Supreme Court of Arkansas in *Ex parte Jackson*, 45 Ark. 160, quoted in 9 Enc. Pl. & Pr. 1073, went so far as to say that, "It would be a disgrace to any government, if the decision of such matters were left to the arbitrary will of one man without appeal or means of revision." No better illustration of the hazard of such a practice is needed than these very cases and the circumstances connected with them, which need not be enlarged upon. But it is needless to consider at length the question of policy in this matter. That is a question for the legislative branch of the government. Suffice it to say that as matter of fact statutes have been enacted in England, Canada, most of the States and by the Congress of the United States allowing appeals in habeas corpus cases. That is perhaps the best

evidence of the trend of opinion on this subject in recent times when conditions are so different from what they were several centuries ago in England. Some of these statutes allow appeals in certain classes of cases only, some confer the right upon the petitioner only. But most contain no limitations. Some courts hold that an appeal or writ of error lies in cases of this kind under a general statute, others that cases of this kind must be expressly mentioned. It will serve no useful purpose to review the cases. Many of them are collected in Church, Hab. Corp., 2nd Ed., Sec. 389b *et seq.* and 9 Enc. Pl. & Pr. 1072 *et seq.*, and notes. Brief reference will be made, however, to a few cases decided by the Supreme Court of the United States. Under a statute which provides generally for appeals in habeas corpus cases without specifying by whom, an appeal may be taken from an order discharging a prisoner as well as from an order remanding him. *In re Neagle*, 135 U. S. 1; *Crowley v. Christensen*, 137 U. S. 86. Under a statute which provides for writs of error from decisions of the highest courts of the States *without referring to habeas corpus cases*, a writ of error lies in a case in which a prisoner has been ordered discharged on habeas corpus. *Ableman v. Booth* and *United States v. Booth*, 21 How. 506; *Tarple's Case*, 13 Wall. 397. In a case in which the statute gives a Circuit Court of Appeal final jurisdiction and provides for no appeal or writ of error to the Supreme Court, an order made by the former in a habeas corpus case may be reviewed by the latter on certiorari, and apparently under another section of the same statute which provides for an appeal from a Circuit Court to the Supreme Court without referring to habeas corpus cases an appeal would lie (though it should be stated that there is another statute not referred to by the court which does expressly provide for appeals from Circuit Courts in habeas corpus cases). *Lau Ow Bew*, 144 U. S. 47.

Let us now turn to our own statutes and practice, upon which, after all, the solution of this question depends. These are appeals from orders made by a Circuit Judge at Chambers. The Act to Reorganize the Judiciary Department (Laws of 1892,

Ch. 57) provides in Section 37 (Civ. L., Sec. 1145) which defines
the jurisdiction of Circuit Judges at Chambers that, "The
Judges of the several Circuit Courts shall have power in Cham-
bers within their respective jurisdictions, but *subject to appeal*
to the Circuit Court and Supreme Courts according to law, as
follows:" Then follow twelve subdivisions, among which is:
"Eighth: To issue writs of *habeas corpus* according to law."
The statute relating to appeals in cases heard by Judges at
Chambers (Sec. 69 of the same Act, as amended by Ch. 109 of
the Laws of 1892 and Ch. 40 of the Laws of 1898; see Civ. L.,
Sec. 1433) provides that, "Appeals shall be allowed from *all*
decisions, judgments, orders or decrees of Circuit Judges in
Chambers, to the Supreme Court, except" in certain classes of
cases appealable to the Circuit Court, to which classes these cases
do not belong. These sections conferring the jurisdiction in
*"habeas corpus"* cases *"subject to appeal"* to the Circuit and
Supreme Courts according to law," and in the same statute pro-
viding that "appeals shall be allowed from *all* decisions" to the
Circuit and Supreme Courts according to the circumstances,
would seem to be clear enough. In *The King v. Liilii*, 8 Haw.
199, it was held that "whatever may be the common law rule as
to appeals from convictions for vagrancy" an appeal lay in such
a case under a general statute which provided for appeals from
Police Justices "in *any* case whether civil or criminal," although
the statute which conferred jurisdiction in vagrancy cases con-
tained no such words as *"subject to appeal."* That appeals do
lie in habeas corpus cases is confirmed by a practice of entertain-
ing such appeals extending over a period of more than forty
years. *In re Flanchet*, 2 Haw. 112; *In re Kauffman*, 2 *Ib.* 313;
*In re Cooper*, 3 *Ib.* 17; *In re Wong Sow*, 3 *Ib*, 503; *In re
Chow Bick Git*, 4 *Ib.* 385; *In re Sheldon*, 9 *Ib.* 32; *In re Tit-
comb*, 9 *Ib.* 131; *In re Matsuji*, 9 *Ib.* 402; *In re Hoopai*, 10
Haw. 610; *In re Fernandez*, 12 Haw. 120. The greater num-
ber of these, it is true, were cases in which the prisoners had
been remanded, but not all of them, for in the *Kauffman*,
*Cooper* and *Wong Sow* cases they had been ordered discharged.

Moreover, as we have seen above, when a statute is held to allow
an appeal at all in a habeas corpus case, courts do not construe
it as giving the right in cases only in which the prisoner is re-
manded, unless the statute itself clearly contains a limitation to
that effect.   We may add that the statute (Civ. C., Sec. 859)
under which the appeals in the *Kauffman* and *Wong Sow* cases
were entertained was substantially the same as that (Civ. L., Sec.
1433) under which the present appeals are taken, but there were
then no such words as "subject to appeal," in the Section (855)
which conferred the jurisdiction in habeas corpus cases.   The
*Cooper* case came up on error but the court said, per Mr. Chief
Justice Allen, that, "It would have been more in accordance
with our practice to have taken an appeal."   It may be that this
Court would not entertain an appeal if the prisoners had been
discharged and had escaped from the jurisdiction, but in the
present cases they are still in custody, and the appeals would
seem to operate as a supersedeas in these as in other cases by the
provisions of Section 71 of the Act of 1892 (Civ. L., Sec. 1435).

The statute of 1847 (Ch. 3, Art. 2, Sec. 6) is relied on to show
that the practice of entertaining appeals in cases of this char-
acter in the earlier Hawaiian cases depended on an express stat-
ute.   But not only was that statute repealed many years before
any of the reported cases above cited were decided, but the men-
tion there made of habeas corpus cases was with reference to
original cases in the Superior Court.   It did not relate to appeals
in habeas corpus cases either to the Superior Court or to the
Supreme Court.

The case of *In re Davis*, 11 Haw. 594, is cited to show that
no appeal lies in a contempt case notwithstanding the general
language of the statute that appeals are allowable from "all de-
cisions," &c., and that therefore habeas corpus cases may like-
wise be excepted by implication.   The remark of the court in
that case, on this subject, although only a *dictum*, was perfectly
true.   The same thing was actually decided in *Onomea Sugar
Co. v. Austin*, 5 Haw. 604.   But contempt cases are not habeas
corpus cases.   They are of a peculiar nature and the decision in

the *Onomea* case was based partly on such peculiar nature and partly on the language of the statute about to be referred to which expressly disallowed appeals in certain classes of cases.

It is contended, however, that these cases come within the provision in Section 70 of the Act of 1892 that "Nothing herein contained shall be construed to permit an appeal to be taken from any order by any Judge or Magistrate allowing any warrant, writ or other process, or for any other order of a like nature." This provision, in our opinion, does not cover final judgments in habeas corpus cases. It relates to preliminary writs and processes and to orders of an interlocutory or discretionary character. *Onomea Sugar Co. v. Austin*, 5 Haw. 604; *Makalei v. Himeni*, 7 Haw. 169. It would exclude an appeal from an order allowing or disallowing the writ in the first instance but not an appeal from the final order remanding or discharging the prisoner. This provision of the statute has been in force during the entire period covered by the above cited cases in which appeals have been entertained and yet it was never supposed to stand in the way of such appeals.

Our attention is called also to Section 1674 of the Civil Laws, although this does not seem to be much relied upon. It provides that "No person who has been discharged upon a writ of *habeas corpus*, shall be again imprisoned or restrained for the same cause, unless he shall be indicted therefor, or convicted thereof, or committed for want of bail, by some Court of Record, having jurisdiction of the cause, or unless after a discharge for default of proof, or for some material default in the commitment in a criminal case, he shall be again arrested on sufficient proof, and committed by legal process, for the same offense."

This section evidently relates to a final discharge—to a discharge, not to a judgment of discharge which has been arrested by an appeal. A prisoner is not discharged within the meaning of this clause until his case is finally determined. If the judgment below is arrested by the appeal and is finally reversed on appeal, the prisoner is not discharged within the meaning of this section. This section apparently has no relation to appeals. It

does not mention appeals. The entire habeas corpus Act is silent on the subject of appeals. If the intention had been to forbid appeals in cases in which prisoners are discharged or in any cases, very different, much simpler and more direct language would have been used. We may add that the Act of 1892 which confers the jurisdiction in habeas corpus cases *"subject to appeal"* and allows appeals from *"all* decisions," &c., is of later date than the section in question, which is Section 30 of Chapter 32 of the Laws of 1870.

The records in these cases are before us in precisely the same way as they always are on appeals from Circuit Judges at Chambers. The error in supposing otherwise arises from mistaking these cases for cases that come up on exceptions from Circuit Courts. These are appeals from Circuit Judges at Chambers, not exceptions from Circuit Courts.

3. The main question is whether the clauses relating to grand and petty juries in the Fifth and Sixth Amendments to the Constitution of the United States were applicable in these islands during the period between the annexation of these islands to the United States and the establishment of a Territorial government here. This is not a new question before this Court. Since annexation many cases have come before the Court involving the application of various provisions of the Constitution to these islands during the period in question, the principal cases being those of *Peacock & Co. v. Republic of Hawaii,* 12 Haw. 27 and *Republic of Hawaii v. Edwards,* 12 *Ib.* 55, both decided May 31, 1899, and *Ex parte Edwards,* 13 *Ib.* 32 and *Territory of Hawaii v. Marshall,* 13 *Ib.* 76, both decided October 9, 1900. In the first two cases respectively the court as regularly constituted held unanimously that the clause of the Constitution relating to uniformity of duties and the clauses relating to grand and petty juries were not applicable here during that period. In the second *Edwards* case the Court held, by one member and a Circuit Judge sitting as a substitute for another member, the third member dissenting, that the clauses relating to grand and petty juries were applicable, and in the *Marshall* case the Court held,

by one member and a member of the bar sitting as a substitute for another, the third member dissenting, that these clauses were not applicable here during that period. The decision in the two cases last mentioned, rendered by majorities of the Court as specially constituted and arriving at opposite conclusions, were filed at the same time and at most off-set each other, leaving the decisions in the other two cases, rendered unanimously by the Court as regularly constituted, in full force. In these four cases, and others that have come before the Court, the view that the Constitution did not extend here in all its fullness, whatever might be true of some of its provisions, seems to have had the support of two former members and two present members of the Court and of a former Circuit Judge and one member of the bar, and to some extent at least of two other members of the bar, sitting as substitutes, while the contrary view has had the support of but one member of the Court and of one Circuit Judge sitting as a substitute. Under these circumstances we should, of course, follow the view adopted in the *Peacock* case, the first *Edwards* case, and other cases of similar purport, unless strong and clear reasons are advanced for reversing those cases. But no flaw is pointed out in the reasoning upon which those cases were decided and no new reasons have been presented in support of the opposite view. The only new element introduced consists of the recent decisions of the Supreme Court of the United States in the so-called "Insular Cases." But these, as we read them, not only do not tend to show error in the view we have hitherto taken, but, so far as they go, support not only our former conclusion but also our former reasoning in a remarkable degree. They refute every argument made by the majority of the court in the second *Edwards* case, with one exception and that they do not pass upon though some of their language pointed strongly against that also. Those decisions, like our own in the cases referred to, were somewhat lengthy and it is unnecessary to refer to or quote from them or from our own former opinions extensively. It will be sufficient to refer to them briefly in respect of the three principal questions involved. (1) Did

the Constitution extend in all its fullness of its own force to these islands immediately upon annexation; (2) Did the particular clauses relating to juries extend here of their own force at that time; and (3) Did the Constitution or these particular provisions become applicable here at that time by force of the language used in the Joint Resolution of Annexation, even if they did not then become applicable here of their own force? Let us consider these questions in their order.

4. Did, then, the Constitution extend here in all its fullness *ex proprio vigore* immediately upon annexation? In the Insular Cases the only clauses of the Constitution that were involved were that which requires that duties "shall be uniform throughout the United States" and other closely related clauses—that is, the clauses that were involved in the *Peacock* case. All nine members of the court were apparently of the opinion, expressed in the *Peacock* case, that after Porto Rico had been taken by conquest and until the ratification of the treaty of peace, the provision in regard to the uniformity of duties "throughout the United States" had no application to that island, for though the island was then subject to the sovereignty of the United States and was to be regarded as a part of the United States by other nations, it was not a part of the United States within the meaning of that provision. But the court was divided in opinion as to the application of that provision to that island after the island had been ceded by the treaty, that is, during the period which we have held corresponded to the period in question in the present cases. A minority of four members of the court apparently were of the opinion that Porto Rico then became a part of the United States within the meaning of that provision. With the minority opinions we need not concern ourselves, forcible though they were. Until the Supreme Court itself reverses the majority decision we are bound to follow it. Of the majority of five, four, namely, Justices Gray, Shiras, White and McKenna, took the view that Porto Rico remained foreign territory after the treaty within the meaning of the constitutional provisions then under consideration, and that territory when acquired by the United

States, though it became domestic for some purposes, remained foreign for other purposes until it became incorporated by Act of Congress as an integral part of the United States. According to their view, the Constitution extended fully to newly acquired territory as soon as Congress showed expressly or by implication that the territory was to be deemed thenceforth fully incorporated as an integral part of the United States, but that until such time, the territory was to be regarded as in a transition state—partly domestic and partly foreign—during which period the Constitution was not applicable as a whole. As Mr. Justice Gray said: "There must, of necessity, be a transition period." The other member of the majority, Mr. Justice Brown, was of the opinion that territory became domestic as soon as acquired but that the Constitution did not fully extend to it until extended by Act of Congress. Thus so far as the Constitution was concerned the theory of a transition period which was the basis of the decision in the *Peacock* and following cases was fully sustained by the majority of the court, both branches of the majority holding that the extension or application of the Constitution to newly acquired territory depended upon the intention of Congress, one branch holding that this was accomplished by incorporating the territory as an integral part of the United States, the other holding that it was accomplished by extending the Constitution to the new territory. The difference in the reasoning by which the two branches of the majority arrived at the same conclusion so far as the Constitution was concerned was not involved in the *Peacock* case, and so it was then, as it is now, unnecessary for us to adopt either line of reasoning, although our former line of reasoning perhaps corresponded more nearly with the views expressed by the four of the five majority. Nor would that difference in reasoning make any difference in the *Peacock* case so far as the construction of the tariff laws was concerned, although it led the two branches of the majority as to the Constitution to opposite conclusions as to the tariff laws in some of those cases.

The Dingley tariff act imposed duties on "all articles imported

from *foreign countries.*" The Foraker Act, which took effect
more than a year after the treaty of cession, imposed special
duties on goods imported into the United States from Porto Rico
and on goods imported into Porto Rico from the United States.
Now, bearing in mind the views of the minority as to the Consti-
tution, and the different views of the majority, both branches
holding that the Constitutional provision was not applicable but
that Congress could legislate as it pleased, but one Justice hold-
ing that after the treaty of cession Porto Rico became domestic
territory though the Constitution did not extend to it, the result
was as follows: Since Porto Rico was domestic territory within
the meaning of the Dingley Act, though not a part of the United
States within the meaning of the constitutional provision, duties
could not be collected on goods imported into the United States
from Porto Rico after the treaty of cession and before the Forak-
er Act (*De Lima v. Bidwell*, 21 Supr. Ct. R. 743; *Goetze v.
United States, Ib.* 742) or upon goods imported into the United
States from Hawaii (*Crossman v. United States, Ib.* 742) or
upon goods imported into Porto Rico from the United States
(*Dooley v. United States, Ib.* 762; *Armstrong v. United States,
Ib.* 827). The four members of the majority as to the Consti-
tution who took the view that Porto Rico remained foreign even
after cession of course dissented, holding that duties could be col-
lected after cession in spite of the express provisions of the Ding-
ley Act. But these Justices were joined by Mr. Justice Brown
in holding that when Congress by the Foraker Act more than
a year after the cession imposed special duties on goods whether
imported from Porto Rico into the United States or *vice versa,*
the duties could be lawfully collected, for the reason that the
constitutional provision had not yet been made applicable to
Porto Rico either by extending it to that island or by incorporat-
ing that island as an integral part of the United States. *Downes
v. Bidwell, Ib.* 770. From this it would seem to follow that the
provision in the Joint Resolution annexing the Hawaiian Islands
to the United States, that, "Until legislation shall be enacted ex-
tending the United States customs laws and regulations to the

Hawaiian Islands the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged," was, as held in the *Peacock* case, a valid exercise of power by Congress, notwithstanding the constitutional provision in question, in other words, as held in that case, that duties could be collected here at Hawaiian rates on goods imported into these islands from the United States and foreign countries during the period in question, although they could not lawfully be collected under the Dingley Act on goods imported into the United States from these islands. The Insular Cases, therefore, appear to sustain both our conclusion and our reasoning in the *Peacock* case. They sustain the view that the Constitution did not in all its fullness *ex proprio vigore* follow the flag to these islands.

5. Do the Insular Cases throw any light upon the next question,—whether the clauses of the Constitution relating to grand and petty juries became applicable here of their own force immediately upon annexation? It is contended that there are certain fundamental guarantees of civil rights which limit the power of Congress wherever it reaches, and that among these are the right not to be held to answer for an infamous crime unless on an indictment by a grand jury or to be convicted of a crime except by a unanimous verdict of a trial jury. In the dissenting opinion in the second *Edwards* case which was adopted by the majority of the Court in the *Marshall* case we pointed out some exceptions to the application of the provisions relating to grand and petty juries, as, for instance, (on pages 72-73) that an American citizen could be lawfully tried, under statutes passed by Congress, for murder committed on an American vessel, and be sentenced to death in an American consular court, in Japan, without any indictment by a grand jury or trial by a petty jury (*In re Ross*, 140 U. S. 453) and that Congress could permit an indian nation, on territory of the United States and subject to the sovereignty of the United States, to conduct trials as it pleased, without reference to the provisions of the Constitution relating to grand and petty juries (*Talton v. Mayes*, 163 U. S.

376). In the same opinion, also, assuming that there might be fundamental limitations which, as was said in *Mormon Church v. United States*, 136 U. S. 1, might exist by inference rather than by direct application of the constitutional provisions to the territories, we showed that the limitations in question were not of that character, saying, among other things: "As to whether the rights in question are among the fundamental rights, *Holden v. Hardy*, 169 U. S. 366, may be cited. In that case, while the court said, much as in the *Mormon Church* case, 'that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defense,' yet it also said that 'the law is, to a certain extent, a progressive science; that in some of the States methods of procedure, which at the time the Constitution was adopted were deemed essential to the protection and safety of the people, or the liberty of the citizen, have been found to be no longer necessary;' that 'in several of the States grand juries, formerly the only safeguard against a malicious prosecution, have been largely abolished, and in others the rule of unanimity, so far as applied to civil cases, has given way to verdicts rendered by a three-fourths majority;' that, quoting from a former decision, 'while we take just pride in the principles and institutions of common law, we are not to forget that in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown;' that 'there is nothing in *Magna Charta*, rightly considered as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age;' and then, in the light of the foregoing, the court added this significant language:

" 'In the future growth of the nation, as heretofore, it is not impossible that Congress may see fit to annex territories whose jurisprudence is that of the civil law. One of the considerations moving to such annexation might be the very fact that the territory so annexed should enter the Union with its traditions, laws-

and systems of administration unchanged.   It would be a narrow construction of the Constitution to require them to abandon these, or to substitute for a system, which represented the growth ·of generations of inhabitants a jurisprudence with which they had had no previous acquaintance or sympathy.'

"In other words, the court considered indictments by grand juries and convictions by unanimous verdicts as matters of procedure rather than of fundamental right; and in holding, as it has held, that indictments by grand juries are not required in the States by the Constitution, even in murder cases, *Hurtado v. California*, 110 U. S. 516; *Bolln v. Nebraska*, 176 U. S. 83, and in apparently acquiescing in the view that verdicts by eight of the twelve jurors could be lawfully received in the States, even in criminal cases, *Thompson v. Utah*, 170 U. S. 343, it took the position that the 'immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard' were not violated."   See also *Maxwell v. Dow*, 176 U. S. 581.

The actual decisions in the Insular Cases were upon tariff questions only, and yet some reference is made to the questions now before us.   The four Justices who held in those cases not only that the Constitution did not apply of its own force in its fullness to newly-acquired territory but that such territory remained for many purposes foreign until incorporated as a part of the United States by Congress, would naturally be expected to hold that the municipal laws of the new territory, including those relating to civil and criminal procedure, would continue in force until changed by the acquiring power, and we find some expressions in their opinions tending to support this view and nothing tending to support the opposite view.   For instance, Mr. Justice McKenna, speaking for himself, Mr. Justice Shiras and Mr. Justice White, quotes with approval in *De Lima v. Bidwell*, at page 760, the passage above set forth as quoted in our former opinion from *Holden v. Hardy*, 169 U. S. 366.   The other member of the majority, Mr. Justice Brown, who had delivered the opinion in *Holden v. Hardy*, above quoted from, and who announced the decision in *Downes v. Bidwell*, pointed out

(at page 780) that in the cases in which the constitutional pro-
visions relating to grand and petty juries had been held to be in
force in the territories, they had been extended there previously
by act of Congress, and said (at page 784) that, "In all these
cases" of territories, "Congress thought it necessary either to ex-
tend the Constitution and laws of the United States over them,
or to declare that the inhabitants should be entitled to enjoy the
right of trial by jury, of bail, and of the privilege of the writ of
habeas corpus, as well as other privileges of the bill of rights."
Still he suggested that certain fundamental rights, distinguish-
able from matters of procedure, might be enforceable in acquired
territory even though the constitutional provisions relating to
such rights might not be in force there *per se*. He said, among
other things (at page 785): "We suggest, without intending to
decide, that there may be a distinction between certain natural
rights, enforced in the Constitution by prohibitions against inter-
ference with them, and what may be termed artificial or remedial
rights, which are peculiar to our own system of jurisprudence.
Of the former class, are the rights to one's own religious opinion,
and to a public expression of them, or, as sometimes said, to wor-
ship God according to the dictates of one's own conscience; the
right to personal liberty and individual property; to freedom of
speech and of the press; to free access to courts of justice, to due
process of law and to an equal protection of the laws; to immun-
ities from unreasonable searches and seizures, as well as cruel and
unusual punishments; and to such other immunities as are indis-
pensable to a free government. Of the latter class, are the rights
to citizenship, to suffrage (*Minor v. Happersett*, 21 Wall. 162),
and to the particular methods of procedure pointed out in the
Constitution, which are peculiar to Anglo-Saxon jurisprudence,
and some of which have already been held by the States to be
unnecessary to the proper protection of individuals."

Thus while the decisions in the Insular Cases related directly
to other provisions of the Constitution, yet the opinions of the
majority of the Justices seem to support our previous views in

regard to the provisions now in question, not only by inference from their reasons and conclusions upon the provision then under consideration, but to some extent also by express language bearing upon the questions now under consideration.

6. Were the constitutional provisions relating to grand and petty juries put in force here by Congress, either by extending the Constitution here or by incorporating these islands as an integral part of the United States, by the Joint Resolution of annexation even though those provisions would not then have become applicable here *ex proprio vigore?* This is perhaps the question of greatest difficulty. It is a question of the construction of the Joint Resolution of annexation. The argument is based on the following paragraph of the Joint Resolution:

"The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this Joint Resolution *nor contrary to the Constitution of the United States* nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine."

We said in the first *Edwards* case (pages 57 *et seq.*) that the argument was that, on the principle of *expressio unius, exclusio alterius,* the expression of an intention to continue in force those Hawaiian laws which were not inconsistent with the Constitution of the United States implied an intention to discontinue those which were inconsistent with the Constitution, and we reasoned that the language used was not in the direct form usually employed by Congress to express such an intention, as that, "The Constitution and laws of the United States shall have the same force and effect in the Territory as elsewhere in the United States;" that the argument was one of inference only, and that if we were to argue from inference we should argue from all the inferences—those from other provisions of the Resolution and those from the Resolution as a whole as well as that from the

clause in question; that the inference in question was not a
necessary inference, for the continuation of certain Hawaiian
laws did not necessarily discontinue others; that the inference
was one of repeal and that repeals by implication were not fav-
ored; that where the Resolution repealed other portions of Ha-
waiian law, such as those relating to Chinese immigration and,
in this very paragraph, Hawaiian treaties, it did so directly and
not by inference; that Congress by the Resolution as a whole
manifested a general intention to allow matters to go on here
about as usual, subject to the supervision of the President, until
it should be in a position to make such changes as should be
deemed best; that it did not go into particulars except with ref-
erence to a very few matters, with regard to which there was
special reason for making particular provision; that it gave the
President very large powers; that it provided that all the civil,
judicial, and military powers exercised by the officers of the ex-
isting government should be exercised until Congress should
provide for the government of the islands, and that the muni-
cipal legislation of the islands with certain exceptions should re-
main in force until Congress should otherwise determine; that it
provided for a commission to recommend such legislation as they
should deem necessary or proper, thus recognizing that it was
not in a position to legislate in detail at that time; that in view
of these provisions it was not likely that Congress intended by
the incidental indirect clause in question to repeal important
portions of Hawaiian law blindly, without knowledge of the re-
sults and without substituting other provisions; that Congress
must have known that there might be branches of law here
which might be entirely proper in themselves and satisfactory
to the people directly interested and yet which might be incon-
sistent with certain provisions of the Constitution, if those pro-
visions were put in force here at that time; that a resolution of
so general a character and passed under such circumstances
should be construed liberally with a view of effecting, if pos-
sible, what was reasonable and just and therefore probably in-

tended; that it was expressly provided that "Until Congress shall provide for the government of such islands *all the civil, judicial, and military powers* exercised by the officers of the *existing government* in said islands shall be vested in such person or persons and *shall be exercised in such manner* as the President of the United States shall direct," and that in the exercise of such power the President directed that, *"The civil, judicial* and military *powers in question shall be exercised* by the officers of the Republic of Hawaii, as it existed just prior to the transfer of sovereignty;" that these were positive provisions under which, in the absence of other provision to the contrary, prosecutions could be conducted without the intervention of grand juries and verdicts rendered by nine out of twelve jurors, and that these positive provisions ought not to be outweighed by the indirect provision in regard to the Constitution; that under similar provisions trials were conducted in Louisiana, when it was acquired, without the intervention of a jury at all; that in view of the foregoing considerations there was much reason to believe that Congress did not intend to extend the Constitution in all its fullness to these islands at that time, and that such construction should be adopted if possible; that it could reasonably be adopted on the theory that the clause "nor contrary to the Constitution of the United States" was of a declaratory as distinguished from a remedial nature, that it was inserted for the purpose of truth and exactness or out of abundant caution, and so should be construed, as it reasonably could be, to mean "contrary to the Constitution in so far as it was then in force here *ex proprio vigore,*" inasmuch as it might be that some parts of the Constitution would be applicable here at once, and in support of this view we pointed out that the main portion of this paragraph of the Joint Resolution, namely, "The municipal legislation of the Hawaiian Islands * * * shall remain in force until the Congress of the United States shall otherwise determine," and the other three of the four qualifying clauses, namely, "not enacted for the fulfillment of the treaties so extinguished," "nor (contrary) to any existing treaty of the United States," and "and not in-

consistent with this joint resolution," were all of a declaratory nature, each expressing merely what would be the truth in the absence of a special provision to that effect, each qualification being inserted for truth and exactness and not for the purpose of expressly repealing laws which would otherwise be in force, and hence that the remaining clause, "nor contrary to the Constitution of the United States" was probably inserted for the same purpose, and that this view was further supported by the fact that Congress could not have intended to extend the Constitution, or have supposed that it became of itself applicable here in its fullness immediately, for it must have known the precedents to the contrary in United States history, and it itself in this very Resolution expressly continued in force the Hawaiian customs laws, notwithstanding the provision of the Constitution that "all duties, imposts and excises shall be uniform throughout the United States." In the second *Edwards* case, in further support of our former view as to the general intention of Congress as shown by the Joint Resolution, we quoted (at page 51) the following among other passages from opinions of the then Attorney-General of the United States: "The resolution is replete with indications that temporarily the relations of the two countries are to continue practically unchanged. Even some of Hawaii's relations with other countries are so to continue; its government is still to exist and collect its revenues; its laws are to remain in force, however at variance with our laws, and the powers—civil, judicial and military—exercised by its officers are still to be exercised. It is, moreover, plainly apparent that Congress regards the establishment of an American government for and the extension of American laws to the islands as matters to be attended to in the future upon a consideration of the wide separation of the two countries in locality and character."

Turning now to the Insular Cases, we find nothing in the opinions of the majority that weakens the effect of the foregoing reasoning. On the contrary there are many passages that seem to confirm it. We shall not take the time or space to enumerate or quote them. One illustration will, however, be given. The

Foraker Act provided that all officials authorized by that act
should "take an oath to support the Constitution of the United
States." From this it might be urged that Congress intended to
extend the Constitution to Porto Rico—an inference, by the
way, drawn by the majority of the court in the second *Edwards*
case from the fact that officers in Hawaii were required (by the
President, not by the Joint Resolution) to take such an oath—
for how, it might be asked, could one take an oath to support the
Constitution and then proceed to act contrary to its provisions?
The answer is, that, as we reasoned in the first *Edwards* case,
some of the provisions of the Constitution might be applicable
even during the transition period and therefore an oath could
properly be taken to support the Constitution in so far as it was
in force *ex proprio vigore*, just as Hawaiian "municipal legisla-
tion" would properly be excepted when "contrary to the Consti-
tution of the United States" in so far as the Constitution was ap-
plicable here of itself, without necessarily making it applicable
as a whole. As Mr. Justice White said in *Downes v. Bidwell*
(at page 807): "The fact that the act directs the officers to
swear to support the Constitution does not militate against this
view, for, as I have conceded, whether the island be incorporated
or not, the applicable provisions of the Constitution are there in
force."

Now let us consider the Insular Cases in regard to the con-
struction of the Joint Resolution without reference to particular
reasons advanced by us.

First, in *Crossman v. United States*, which was a case direct-
ly relating to Hawaii, the court placed Hawaii during the period
in question in the same category with Porto Rico, and, as we
have seen in the cases relating to Porto Rico, it held that the
Constitution had not become fully applicable there.

Secondly, in the cases relating to Porto Rico we find refer-
ences to Hawaii pointing in the same direction. For instance,
Mr. Justice Brown, in *Downes v. Bidwell*, (at page 775) after
reviewing the cases of Louisiana and Florida with reference to

their transition periods, spoke of Hawaii in much the same way, as follows:

"So, too, in the act annexing the Republic of Hawaii, there was a provision continuing in effect the customs relations of the Hawaiian Islands with the United States and other countries, the effect of which was to compel the collection in those islands of a duty upon certain articles, whether coming from the United States or other countries, much greater than the duty provided by the general tariff law then in force. This was a discrimination against the Hawaiian ports wholly inconsistent with the revenue clauses of the Constitution, if such clauses were there operative."

Mr. Justice White also, speaking for Mr. Justice Shiras and Mr. Justice McKenna as well as for himself, in the same case apparently took the view that Hawaii did not become incorporated as a part of the United States until the Organic Act took effect. He said (at page 794): "By joint resolution of Congress the Hawaiian Islands came under the sovereignty of the United States in 1898; and on April 30, 1900, an act for the government of Hawaii was approved by which the Hawaiian Islands were given the status of an incorporated territory."

Thirdly, the majority of the court in the Insular Cases held that even the Foraker Act did not incorporate Porto Rico as an integral part of the United States, comprehensive though that act was. That act, besides providing a tariff, established a government for Porto Rico, and a body politic to be called "The People of Porto Rico," with executive, legislative and judicial departments. It provided for a governor, secretary, attorney-general, treasurer, auditor, commissioner of the interior and commissioner of education, to be appointed by the President of the United States by and with the advice and consent of the Senate. It provided for a legislature to consist of an executive council and house of delegates, and provided for elections. It provided a judiciary much like that in Hawaii, consisting of the courts of Porto Rico and the District Court of the United States, and made provision for appeals and writs of error to the Supreme

Court of the United States "as from the supreme courts of the Territories," and that "such writs of error and appeal shall be allowed in all cases where the Constitution of the United States, or a treaty thereof or an act of Congress is brought in question and the right claimed thereunder is denied." It provided that judicial process should run in the name of "United States of America, ss: the President of the United States," and that all officials authorized by the act should "take an oath to support the Constitution of the United States." It provided for the substitution of coins of the United States for those of Porto Rico, and for the nationalization of Porto Rican vessels, and that the statutory laws of the United States, not locally inapplicable, should, with certain exceptions, have the same force and effect in Porto Rico as in the United States. And yet the court held that Porto Rico had not been incorporated as a part of the United States so as to make the Constitution fully applicable to that island. How much more then would it seem that Hawaii did not become so incorporated by the Joint Resolution of annexation.

A further ground for believing that Congress did not intend to fully extend the Constitution here or fully incorporate these islands as an integral part of the United States, is the construction put upon that Resolution by Congress itself as shown by the Organic Act of April 30, 1900. It was then and not until then that Congress felt itself in a position to determine the status of Hawaii. It was not until then that Congress provided a government for these islands; that it determined the status of their people (Sec. 4); and that it declared, in its usual way of expressing such an intention, that the Constitution and laws of the United States not locally inapplicable should, with certain exceptions, have the same force and effect in those islands as elsewhere in the United States (Sec. 5). It then declared that, "No person shall be convicted in any criminal case except by unanimous verdict of the jury," and made some provisions for grand juries (Sec. 83) as if indictments by grand juries and unanimity of verdicts by petty juries had not previously been required.

It is well known that criminals were recently, and we believe still are prosecuted in both Porto Rico (See *Ex parte Baez*, 177 U. S. 378) and the Philippines without indictments by grand juries or trials by petty juries. If we remember rightly the President in his directions to the Philippine Commission omitted reference to these matters though he enjoined the recognition of what we have referred to above as the fundamental rights.

The order appealed from is reversed and the prisoner remanded to custody.

*Geo. A. Davis* and *F. M. Brooks* for the petitioner.
*Attorney-General E. P. Dole* for the respondent.

DISSENTING OPINION OF GALBRAITH, J.

The proceedings in these "crown cases" or habeas corpus appeals have been most extraordinary and, as it seems to me, wanting in some of the necessary elements to entitle them to be called "legal proceedings."

When the special term of the Supreme Court convened on the 12th instant there was on the printed calendar six habeas corpus cases. Four of these were attempted appeals by the Attorney-General from the orders of the Judge of the First Circuit Court discharging the petitioners. The court ordered that the habeas corpus cases be taken up first. That of Osaki Mankichi was the first in order and the entry on the clerk's minutes was made in that case. The clerk's minutes also shows that counsel agreed to submit the other four cases with this one, the same question being involved in each case. The five cases were argued and submitted as one case. After the hearing the attorneys resisting the appeals filed an exception to one of the Justices of this court taking further part in the determination of the questions raised, alleging disqualification under the provisions of Section 84 of the Organic Act, said Justice as Circuit Judge having signed the indictment, presided at the trial and sentenced three of the petitioners to the imprisonment from which they obtained release by the writs of habeas corpus

sought to be reviewed in these proceedings. The majority have decided that this member of the court is not disqualified but instead of rendering the decision in the cases as argued and submitted have proceeded to divide the cases separating that of Ah Oi, at whose trial the Justice did not preside, and rendered the opinion in that case to be followed as a precedent in the other cases and to be filed, of course, "on the same day." When it is remembered that the identical question is raised in the cases in which the Justice sat as Circuit Judge and passed judgment as the one in which his associate entered judgment does any good reason appear for this shuffling and separating the cases? To ask this question is to answer it. As an acrobatic performance such proceedings might command my admiration but as the studied act of an appellate court in cases involving life and liberty I am compelled to enter an earnest protest against it.

Was the objection to the qualification of the Justice well taken? To me it does not seem a debatable question. Circuit Judge Gear decided that Circuit Judge Perry committed an error of law in sentencing persons accused of infamous crimes to years of imprisonment without an indictment by a grand jury and on the minority verdict of a petty jury. The Attorney-General affirms that Judge Gear was wrong and that Judge Perry was right and attempts to bring the cases before this court with the object of having this court decide that Judge Gear was wrong and Judge Perry was right. Now can Mr. Justice Perry approach the consideration of the question with the impartial and unbiased mind that the law requires and the petitioners have a right to demand of a judge? The majority of the court have answered this question in the affirmative. I think they are wrong. To call the cases civil proceedings and to say that they are not the same cases in which Judge Perry rendered judgment does not change the issue or befog the question. "No judge shall sit on an appeal, or new trial, in any case, in which he may have given a previous judgment," is the language of the Organic Act. It is the "previous judgment"

rendered by Circuit Judge Perry that is affirmed by the majority opinion.

Aside from this positive provision of the Organic Act the Justice would be disqualified under the general principles of the law, "No man shall be a judge in his own cause" is a maxim that is ancient in use and of universal application in Anglo-Saxon communities. "There is also a maxim of law regarding judicial action which may have an important bearing upon the constitutional validity of judgments in some cases. No one ought to be a judge in his own cause; and so inflexible and so manifestly just is this rule, that Lord Coke has laid it down that "even an act of parliament made against natural equity, as to make a man a judge in his own case, is void in itself, for *jura naturae sunt immutabilia,* and they are *leges legum.*"

"This maxim applies in all cases where judicial functions are to be exercised, and excludes all who are interested, however remotely, from taking part in their exercise. It is not left to the discretion of the judge, or to his sense of decency, to decide whether he shall act or not; all his powers are subject to this absolute limitation; and when his own rights are in question, he has no authority to determine the cause." Cooley, Const. Lim., p. 506. Again the same distinguished author says, "The judge acting in such a case is not simply proceeding irregularly, but he is acting without jurisdiction. And if one of the judges constituting a court is disqualified on this ground, the judgment will be void, even though the proper number may have concurred in the result, not reckoning the interested party." *Id.* p. 509.

Mr. Justice Bell speaking for the Supreme Court of New Hampshire said, "The most perfect integrity that can be in judges is no hindrance why the parties, who have causes depending before them, may not challenge them, or except against them, and why they ought not of their own accord to abstain from hearing causes in which they may have some interest, or where there may be some just ground for suspecting them, and they themselves are obliged to declare the causes which may render them suspected, if the parties are ignorant of them." *Moses v. Julian,* 45 N. H. p. 52.

· Has the Territory the right to appeal from the order of the circuit judge discharging the petitioner? The majority opinion says: "Some courts hold that an appeal or writ of error lies in cases of this kind under a general statute, others that cases of this kind must be expressly mentioned." I submit that the courts that hold that appeals may be taken in habeas corpus cases under a general statute may be counted upon the fingers of one hand and that the overwhelming weight of authority is squarely against such holding. The general rule is thus stated. "A judgment on habeas corpus proceedings, either discharging the prisoner or remanding him, cannot be reviewed on appeal or writ of error unless authorized by statute." *Church on Habeas Corpus* (2nd ed.) Sec. 586a. The fact admitted in the opinion that "statutes have been enacted in England, Canada, most of the states and by the Congress of the United States allowing appeals in habeas corpus cases," is a confirmation of the correctness of the above rule and an absolute refutation of the claim that an appeal can be taken in such cases under a statute allowing appeals generally and that an appeal in such cases can be taken under Sec. 1433 Civil Laws.

The citations of cases from the United States Supreme Court can scarcely be in point on the issues presented in the cases at bar. The language of the statute permitting appeals to the United States Circuit Court is as follows: "From the final decision of any court, justice, or judge inferior to the Circuit Court, upon an application for a writ of habeas corpus or upon such writ when issued, an appeal may be taken to the Circuit Court for the district in which the cause is heard: * * * (Sec. 763 U. S. Revised Statutes.) Section 764 provides for an appeal from the final decision of the Circuit Court to the Supreme Court of the United States in certain cases and the following section provides for the disposition of the prisoner pending appeal and the method "for sending up to the appellate tribunal a transcript of the petition, writ of habeas corpus, return thereto, and other proceedings.

The majority find that section 1145 Civil Laws and section 1433 Civil Laws construed together give the right to appeal in habeas corpus cases in this Territory. Section 1145 reads in part "The judges of the several Circuit Courts shall have power in Chambers within their respective jurisdictions, but subject to appeal to the Circuit and Supreme Courts according to law, as follows:" Then follows twelve subdivisions enumerating subjects over which Circuit judges may take jurisdiction at Chambers. The eighth subdivision is "To issue writs of habeas corpus according to law." From the use of the phrase "subject to appeal to the Circuit and Supreme Courts" in said section it might be inferred that the legislature intended to provide for appeals in habeas corpus cases but I insist that the mere expression of an intention to do a thing is not doing the thing. The legislature is presumed to have known that at the time section 1145 was enacted that what is now published as chapter 105 Civil Laws was a part of the law of the Islands: that this chapter is composed of thirty-five sections all relating to habeas corpus and that not one word is found therein expressive of an intention or purpose that appeals were allowable in such cases. With these lights before it the legislature made no specific provision for appeals in habeas corpus cases. No provision was made for the disposition of the prisoner pending the appeal in cases where he was discharged by the Circuit Judge. No provision was made for bringing the record before the appellate court. So it seems that the majority really have only section 1433 allowing appeals generally on which to base the conclusion that appeals lie in these cases. This is not sufficient.

As to the practice in this jurisdiction giving the right to appeal I do not think the claim well founded. The citation of the cases from the earlier Hawaiian reports do not tend to substantiate this claim for the reason that during a part of the "sixty years of the judicial history of these islands" appeals in habeas corpus cases were allowed by statute and in neither of the two cases cited from the later reports was the question

36

raised and under the established rules of practice the court was not expected to raise the question of its own motion so no inference can be drawn from these cases. We do not know what the decision would have been had the question been raised. During the reign of Kamehameha III an act was passed creating "The National Courts of Record." Section 4 of Article 1 of said act gives to the Circuit Courts power *"to grant writs of habeas corpus."* Section 6 of Article 11 of the act reads in part as follows: "The Superior Court shall have full appellate jurisdiction, subject to the review and reversal of the Supreme Court, of all matters and controversies, civil, criminal or mixed, equitable or legal, public or private, from any inferior court, for causes of exception assigned, or when no exception has been assigned; or upon writs of error, certiorari, or habeas corpus allowed by either of the justices of the said Superior Court, upon subsequent assignment of error, or causes shown at Chambers." * * * "Any of said suits, actions or controversies so cognizable before the Superior Court, whether entered originally or on appeal as aforesaid, may be carried to the Supreme Court of judicature created by the constitution and hereinafter methodized." (*Hawaiian Laws* 1845 to 1856; Act III.)

How long this practice continued I am not advised nor do I know whether the legislature discovered that it was not a satisfactory practice to permit appeals from decisions of circuit judges in favor of personal liberty and repealed the statute. But it seems to me that it is discrediting the wisdom of the early patriots of the country to hold that an appeal now lies under a general statute when the early law givers thought it necessary to specifically mention habeas corpus in order to give an appeal.

Again the majority hold that there is no exception contemplated in section 1433; that appeals lie in *all* cases from final decisions, etc., of circuit judges. A decision of a circuit judge *at chambers* adjudging a person guilty of contempt is a final decision. The Supreme Court of the Republic in 1898, after

this statute, (section 1433) was in force, said, "We have no statute authorizing an appeal in matters of contempt." (*In re Davis*, 11 Haw. 598.) This is one exception and one final decision from which no appeal would lie under this section. The effect of the majority opinion is to overrule this decision.

It seems that the majority over-looked an important provision in section 1434 which provides that "every such appeal shall be taken on the record." So admitting that an appeal will lie in these cases it must be taken in such a manner as to bring the record before this Court for review. Where is the record in these cases? The decision of this Court on an appeal case to be binding must be based upon *a record*. There is no record in this case unless we call the briefs and exceptions to the qualification to one of the justices a record. So far as my experience goes this Court has been rather exacting in requiring the record in appeal cases to be brought properly before it. Only recently the Court constituted of the present majority and "a member of the Bar" said relative to a deed that had been incorporated into the body of a bill of exceptions, allowed and certified by the Circuit Judge, "This deed has not been made a part of the bill of exceptions or of the record in this Court, and therefore cannot be considered by us on the exceptions. (*Keliiilihune v. Vierra, ante* 29-30.) Are we now going to relax the rule and say to any enthusiastic counsel that may be displeased with the decision of the Circuit Judge that he can grab up the records of the Circuit Court and bear them into this and we will consider them as a "record on appeal"?

I have seen the files of the Circuit Court in these cases. Not one of them bears the file mark of the Supreme Court or have been properly brought into this Court or are a part of the records of this Court. This, however, seems to be no obstacle to the majority rendering judgment and proceeding as though the cases were properly in this Court. This is one illustration of the many embarrassments that may result from the Court's interpretation of this statute on appeals.

What disposition is to be made of the prisoner pending appeal

where the Circuit Judge orders his discharge? It may not be convenient to call a special session of the Supreme Court every time the Circuit Judge discharges a prisoner that the Attorney-General thinks ought to be remanded. Long months may intervene between the discharge and the hearing on appeal, and it may happen in some cases that the appellate court might sustain the Circuit Judge,—is the prisoner to remain in jail pending the appeal?

Then again, are we to countenance and approve the practice adopted by the Attorney-General, in these cases, of re-arresting the prisoners after their discharge and holding them in confinement until his appeal is decided? If so, it seems that the writ of habeas corpus had better be "repealed" altogether. Under such practice "the great writ of liberty," in this jurisdiction, is a "false alarm."

I am thoroughly convinced that the majority have no power to render a valid judgment in this case for the reasons given, to wit, (1) that one of the majority is disqualified; (2) that no appeal lies in habeas corpus cases; (3) that there is no record before the court on which a valid judgment can be based. Holding this view I can scarcely treat the majority opinion as a decision of the court but considered as a well written dissertation on an interesting question of law I will say that I have an absolute answer to every argument therein advanced, that is, I am of a different opinion. The reasons for this opinion are fully set out in the opinion of the court in the case of *Ex parte Edwards, ante,* pp. 32 to 49, and it will be unnecessary to reiterate them here.

I am not unmindful of the fact that in forming this opinion it was necessary to reach another conclusion involved in the determination, that is, that those who were responsible for the administration of the law in these islands between July 7th, 1898, and June 14, 1900, committed grave errors in charging, trying and convicting persons accused of infamous crimes in a manner unknown to the Constitution and laws of the United States. I am willing to concede to them an honest purpose and

unanimity of belief. The majority say, "The view that the Constitution did not extend here in all its fullness whatever might be true of some of its provisions, seems to have had the support of two former members and two present members of the court and of a former Circuit Judge and one member of the bar, and to some extent at least of two other members of the bar, sitting as substitutes, while the contrary view has had the support of but one member of the court and of one Circuit Judge sitting as a substitute." I insist, however, that if the question is to be determined by a "show of hands" that the circle ought, in all fairness, to be extended beyond the limits prescribed by the majority.

The majority base the conclusion in this case on the "views adopted in the *Peacock* case and the first *Edwards* case," and the claim is made that these views are supported to a "remarkable degree" by the recent decisions of the United States Supreme Court in the "Insular Cases." It is pleasant to note the cheerfulness produced by this discovery, but I am inclined to the belief that the claim is not well founded and that the enthusiasm of the majority to find confirmation of "the reasoning in the *Peacock* case" prevented the exercise of the powers of discrimination displayed on other occasions and on other subjects.

The reasoning in the *Peacock* case is based principally on the case of *Fleming v. Page*, 19 How. (U. S.) 603, and this case the Supreme Court of the United States say was "practically overruled" by *Cross v. Harrison*, 16 How. 164.

"From this *resume* of the decisions of this court," says Mr. Justice Brown, "the instructions of the executive departments and the above Act of Congress, it is evident that from 1803, the date of Mr. Gallatin's letter, to the present time, there is not a shred of authority, except the dictum in *Fleming v. Page* (practically overruled in *Cross v. Harrison*), for holding that a district *ceded to and in the possession of* the United States remains for any purpose a foreign country." *De Lima v. Bidwell*, 21 Sup. Ct. Rep. 752.

Again, the author of the majority opinion in this case in closing the dissenting opinion in the second *Edwards* case, said, "Since the foregoing was written, the text of the decision in *Goetze v. United States*, 103 Fed. Rep. 72, has been received. It is strongly confirmatory of the above reasoning and the reasoning in the *Peacock* case above referred to." *Ante*, 76. This *Goetze* case was decided by the United States Circuit Court for the Southern District of the State of New York. An appeal was taken from this decision to the United States Supreme Court. The *Goetze* case was one of the "Insular Cases" recently decided. What did the United States Supreme Court do with this case that was so "strongly confirmatory of the reasoning in the *Peacock* case?" *Reversed it.* (21 Sup. Ct. Rep. 743.)

With *Fleming v. Page* overruled and *Goetze v. United States* reversed, it seems that the "reasoning in the *Peacock* case" remains with us little less than a disembodied shadow, thin substance on which to hang the decision in the case at bar.

The decision in the *De Lima* case settled one question squarely, that is, that when possession was delivered under the Newlands resolution the Hawaiian Islands became domestic territory of the United States and was not a foreign country for any purpose. The theory of "inchoate or partial annexation" finds no support in that decision. The question raised in the case was whether the island of Porto Rico after the ratification of the treaty of cession was "foreign country" in the meaning of the Dingley tariff law authorizing the collection of customs duties on goods imported from a "foreign country." The court said that when the island ceased to be foreign it became domestic and it ceased to be foreign immediately on the exchange of ratifications of the treaty of cession and the delivery of possession thereunder. In the *Bidwell* case the question was whether or not after the passage of the Foraker Act, providing for a temporary government for the island it then became a part of the "United States" within the provision of the Constitution requiring all "duties," etc., to be uniform throughout the United States. The court held that the island was "a territory appur-

tenant and belonging to the United States, but not a part of the
United States within the revenue clauses of the Constitution."

The reasoning by which the court arrived at the conclusion
and judgment announced in those cases is interesting and in-
structive, and the individual opinions of the judges are replete
with learning but the important fact must not be lost sight of,
that all of the questions raised and passed upon in those cases
related to the revenue clauses of the Constitution—questions
that affected property only. That no question was raised rela-
tive to the fundamental safeguards to life and liberty contained
in the 5th and 6th Amendments. These last are of a different
character and cannot be considered with the former unless life
and liberty are placed on a commercial basis. This cannot be
done under the Constitution and laws of the United States.
This is a distinction that the court failed to make in the first
*Edwards* case, a case involving liberty, where the decision was
based on the "reasoning in the *Peacock* case," a case involving
a commercial question pure and simple.

Judge Brannon of the Supreme Court of West Virginia says,
*"Strictly speaking, we can assign no limit otherwise to the
power of Congress over the territories except that found in
the Fifth and Sixth Amendments, but they bear sway wherever
the flag waves over territory within the civil jurisdiction of
the United States. Those amendments tie the hands of Con-
gress wherever it makes laws for civil government* (the italics
are mine). Justice Brewer so declared. The Constitution
stretched over these islands the moment they became territory
of the nation to give them freedom, just as the Thirteenth
Amendment abolished slavery at once in Alaska, as held in
*In re Sah Quah* (31 Fed. Rep. 327). The proclamations of
President McKinley have declared and admitted these prin-
ciples of free government as the right of Filipinos and Porto
Ricans. He so directed the military commander and the com-
missioners sent to the Philippine Islands. So this governmental
action concedes this doctrine." *Brannon, Fourteenth Amend-
ment*, pp. 36 and 37.

The discussion of the question whether the Constitution came to these islands *ex pròprio vigore* with the acceptance of the cession to the United States, or by the express terms of the Newlands resolution, or whether it came in whole or in part only, may be interesting and profitable but is not altogether pertinent to the issue presented. The question ought to be determined by the language of the Resolution independent of the fact whether the Constitution came or remained at home.

By the terms of the resolution certain municipal legislation of the Hawaiian Islands "not inconsistent with the Constitution of the United States" was continued in force until such time as the Congress of the United States should otherwise determine. Congress must have had some purpose in placing this phrase in the resolution. It is possible that it was inserted out of abundance of caution. It is possible that the representation had been made to Congress that the government of the Hawaiian Islands was "the best on earth;" that American civilization was firmly established here and that the laws and institutions were modeled after American laws and institutions. It is possible that these representations were believed and relied on by the author of the resolution or the committee that reported it but out of abundant caution to avoid any possibility of continuing in force any of the Hawaiian laws that were "contrary to the Constitution of the United States," if there were any, this phrase was inserted. This it seems was the clear purpose and intent of Congress. If this interpretation is correct it follows that any laws of the Hawaiian Islands that were contrary to the Constitution of the United States were annulled and abrogated by the resolution no matter whether the Constitution was here or elsewhere. It seems to be conceded that the provision of the Hawaiian law authorized the Circuit Judges to perform the functions of a grand jury and for nine jurors to return a verdict are now contrary to the Constitution. If these laws are now contrary to the Constitution they were so on July 7th, 1898, and were abrogated and annulled by the resolution. The Constitution

has not changed. It is the same now as on the 7th day of July, 1898.

The argument advanced at the hearing that it cost "a great deal of money" to convict these petitioners and that to hold their conviction illegal would mean a general jail delivery is unworthy of serious consideration. If they were illegally convicted they are entitled to their freedom and those who were responsible for the error ought to bear the burden. It was pointed out how such results could have been avoided in *Ex parte Edwards*, (see *ante*, pp. 47 and 48).

It is common knowledge that the provision of Sec. 83 of the Organic Act, authorizing "Grand Juries to be drawn in the manner provided by Hawaiian statutes for drawing petty juries" cannot be and has not been enforced for the reason that when the parts of the Hawaiian statutes providing for drawing petty juries annulled by the Organic Act were stricken out not enough remained to provide a method for drawing a jury of any kind and that since June 14th, 1900, grand and petty juries have been drawn under the common law powers of the Circuit Courts and in the manner provided by the common law. The prison is being filled with convicts indicted and convicted by juries drawn in this manner and no question as to its legality has been raised. The Circuit Courts during the time these petitioners were convicted had the same powers in this respect that the Circuit Courts have exercised since June 14th, 1900.

The "appeals" should be dismissed and the decision of the Circuit Judge affirmed.